**UNITED STATES of America, Plaintiff,**

**v.**

**AN ARTICLE OF DEVICE CONSISTING OF 1,217 CARDBOARD BOXES, more or less, each containing an individually packaged unit in a tube packaged in a blister-pack with an insert labeled in part as follows:**

**(box)**

**" * * * stryker * * * A0931660404261C * * * B311001c * * *",**

**(tube)**

**"stryker Shoulder 130–10 Dacron * Ligament Prosthesis * * *", Defendant.**

**No. K 84–502.**

United States District Court, W.D. Michigan, S.D.

April 2, 1985.

Thomas Martin, Asst. U.S. Atty., Grand Rapids, Mich., Mark A. Heller, Assoc. Chief Counsel for Enforcement, Food & Drug Admin., Rockville, Md., for plaintiff.

Grant Gruel, Grand Rapids, Mich., for defendant.

OPINION

ENSLEN, District Judge.

This action was filed on November 20, 1984 against a prosthetic shoulder ligament device, manufactured by Meadox Medicals, Inc., and distributed by Stryker Corporation. The device is used in the surgical repair of third-degree, and sometimes second-degree, acromioclavicular separation, a severe dislocation of the joint which stabilizes the clavical (collarbone) and scapula (shoulder blade). *See,* 1A Gordy & Gray, *Attorneys' Textbook of Medicine* ¶ 5.40–5.-

49 (1984). Such injuries often result from a fall with an outstretched arm, a force from above striking the shoulder, or a sudden or severe pull on the arm. *Id.* The Stryker device is used to pull and hold together the separated bones in the proper alignment.

The US filed the Complaint in this action pursuant to the Federal Food, Drug and Cosmetic Act (the Act) (21 U.S.C. § 301 *et seq.*) alleging that the Stryker device is misbranded and adulterated. On November 28, 1984, the United States Marshal seized 1,217 boxes, each containing one Stryker device, pursuant to a warrant for arrest. On December 3, 1984, Stryker filed its claim as owner of the seized articles. The Complaint requests the Court to condemn the seized devices, order their disposal pursuant to the Act, and grant Plaintiff costs. This Opinion is rendered after a hearing held March 22, 1985, upon claimant Stryker's Motion for Summary Judgment filed December 5, 1984, and the government's cross-Motion for Summary Judgment filed March 20, 1985.

### Standard of Review

To warrant the grant of summary judgment, the moving party bears the burden of establishing the non-existence of any genuine issue of fact that is material to a judgment in his favor. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 147, 90 S.Ct. 1598, 1603, 26 L.Ed.2d 142 (1970); *United States v. Articles of Device ... Diapulse*, 527 F.2d 1008, 1011 (CA 6 1976); *Nunez v. Superior Oil Company*, 572 F.2d 1119 (CA 6 1978); *Tee-Pak, Inc. v. St. Regis Paper Company*, 491 F.2d 1193 (CA 6 1974). If no genuine issue as to any material fact is established, the moving party is entitled to judgment as a matter of law. *Chavez v. Noble Drilling Company*, 567 F.2d 287 (CA 5 1978); *Irwin v. US*, 558 F.2d 249 (CA 6 1977).

In determining whether or not there are issues of fact requiring a trial, "the inferences to be drawn from the underlying facts contained in the (affidavits, attached exhibits, and depositions) must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bohn Aluminum & Brass Corporation v. Storm King Corporation*, 303 F.2d 425 (CA 6 1962). Even if the basic facts are not disputed, summary judgment may be inappropriate when contradictory inferences may be drawn from them. *United States v. Diebold, supra; EEOC v. United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry, Local 189*, 427 F.2d 1091, 1093 (CA 6 1970). In making this determination, the Court must make reference to the entire record and all well pleaded allegations are to be accepted as true. *Dayco Corporation v. Goodyear Tire and Rubber Company*, 523 F.2d 389 (CA 6 1975); *Holmes v. Insurance Company of North America*, 288 F.Supp. 325 (DC Mich.1968); *Mahlar v. U.S.*, 196 F.Supp. 362 (DC Pa 1961). These guidelines will be adhered to as substantive issues of the motion are examined.

In 1976, Congress passed the Medical Device Amendments to the Act, PL 94–295, erecting a system for medical device classification and premarket approval. The amendments became effective May 28, 1976. These statutory provisions and their enforcing regulations are complicated. They will be dissected as each issue contained in the Motions for Summary Judgment is reviewed.

### MISBRANDING

Section 502(*o*) of the Act, 21 U.S.C. § 352(*o*) provides in pertinent part that a device is misbranded if no premarket notification has been filed when required by § 510(k) of the Act, 21 U.S.C. § 360(k), or if it is not listed as required by § 510(j) of the Act, 21 U.S.C. § 360(j). The Government asserts in its Complaint, and argues in its motion, that both requirements are applicable to the Stryker device which complies with neither.

### 1. Premarket Notification

Section 510(k) of the Act, 21 U.S.C. 360(k), provides that each person required

to register and who proposes to introduce a medical device into interstate commerce shall report to the Secretary of Health and Human Services at least 90 days before making such an introduction. (The Secretary has delegated this authority to the Commissioner of the Food and Drug Administration, 21 C.F.R. § 5.10(a)(1)). 21 C.F.R. Part 807, Subpart E implements this premarket notification requirement. The premarket notification requirement applicable to Stryker is contained in 21 C.F.R. § 807.81(a)(2). It provides that a person required to register, who introduces a device for the first time, must provide premarket notification. Stryker has admitted that it first commercially distributed the device itself after June of 1982, well after the effective date of the amendments. (*See*, Govt. Exhibit C, Response 4). Stryker does not dispute that it is a person registered or required to register. It must therefore comply with this premarket notification requirement unless exempt.

■ 21 C.F.R. § 807.85 details the exemptions from premarket notification. 21 C.F.R. § 807.85(b) provides that a distributor who places a device into commercial distribution for the first time under his own name, as Stryker did in June of 1982, is exempt from the premarket notification requirement if the device was in commercial distribution before May 28, 1976. The Government asserts that this exemption does not apply to Stryker because the device, as it is now in distribution, is so changed from that in distribution prior to the effective date, that it is an entirely new device. Though Stryker hotly disputes that the device is "new", it does not invoke this exemption, but argues instead that 21 C.F.R. § 807.81(a)(3) provides an exemption applicable to it. This provision states that a device which a person currently has in commercial distribution that is about to be significantly changed or modified requires a premarket notification. It defines a significant change or modification as one that could either significantly affect the safety or effectiveness of the device, or one that constitutes a major change or modification in the intended use of the device. Stryker asserts that because the changes which have occurred in the device since 1976 do not rise to this significance, the device is exempt from premarket notification.

■ I find that Stryker's argument misinterprets these applicable regulations. 21 C.F.R. § 807.81(a)(3) applies only to those persons who have a device in commercial distribution at the time that the modification is about to be made. Stryker, by its own admission, did not begin distributing the device until June 1982. Numerous exhibits and affidavits submitted by both parties indicate that the modifications which occurred to this device occurred not later than 1979. Accordingly, this provision is inapplicable to Stryker. Only the premarket notification requirement contained in 21 C.F.R. § 807.81(a)(2) applies to Stryker. Therefore, the sole exemption available to Stryker is contained in 21 C.F.R. § 807.85(b). Only if the device were in commercial distribution before May 28, 1976, would it be exempt from the premarket notification requirement. Though Stryker has not specifically invoked this exception, because of Stryker's assertion that the device is not "new", and its admission that it first commercially distributed the device itself after June of 1982, the Court will consider the applicability of this exemption to the device in question. Because the Act concerns the public health, the exemption will be strictly construed and Stryker must prove each of its elements. *U.S. v. Articles of Drug: 5,906 boxes*, 745 F.2d 105, 113 (CA 1 1984); *US v. An Article of Drug "Bentex Ulcerine"*, 469 F.2d 875, 878 (CA 5 1972).

■ Compliance Policy Guide 7124.26 is the current expression of the Food and Drug Administration's (FDA's) interpretation of "commercial distribution". (Govt. Exhibit H.) This policy guide states:

If a manufacturer can meet all of the following conditions, we consider a device to presently be in commercial distribution and also to have been in commercial distribution before May 28, 1976, even though no units of the device had

been delivered to purchasers or consignees before that date:

(1) The device was displayed, advertised, or otherwise offered for sale before May 28, 1976, for a specific intended purpose or purposes, with no limitations (e.g. no limitation to research or investigational use).

(2) The manufacturer had, before May 28, 1976, accepted, or been prepared to accept, at least one order to purchase the device that resulted, or would have resulted, in a contract of sale for the device in the United States, generally with delivery to occur immediately or at a promised future date;

(3) The device was not being offered or accepted only for research or investigational use;

(4) The manufacturer of the device can provide adequate documentation establishing (1) through (3) above to the satisfaction of the Food and Drug Administration.

The parties hotly debate whether the Stryker device was in commercial distribution pursuant to this interpretation prior to May 28, 1976. This debate is not new to this lawsuit. On August 10, 1983, the FDA issued a Regulatory Letter to Stryker alleging that the device was not lawfully in commercial distribution. For the next 14 months, a flurry of correspondence was exchanged between FDA representatives and Claimant. *See,* Documents attached to Claimant's Motion for Summary Judgment. In this correspondence, Claimant contended that the Regulatory Letter represented a reversal of previous FDA policy as set forth · in the Compliance Policy Guide. Stryker submitted documentation to FDA in support of its argument that it met the compliance policy criteria for the shoulder ligament device. Among other things, these documents asserted that Dr. James A. Arnold was using the Meadox product as early as August through October of 1975 for shoulder fixation, with the knowledge of Meadox, and that Meadox continued to sell the product to Dr. Arnold knowing of his use. The FDA rejected this

documentation as inadequate and consistently found that the product had not been in commercial distribution before May 28, 1976. After repeated requests that Stryker indicate the steps it intended to take to come into compliance with the law as FDA interpreted it were met with renewed assertions by Stryker that it was already in compliance, the FDA filed this suit and perfected seizure.

Whether the device was in commercial distribution before May 28, 1976, is a factual issue. The parties have submitted voluminous affidavits and exhibits, and the government's are particularly detailed. The contest for who shall prevail has become a battle of affidavits and exhibits.

In one of the letters exchanged during the pre-suit correspondence between FDA representatives and the Claimant, Joseph P. Hile stated in a letter dated May 25, 1984, to Stryker's then attorney, Michael F. Cole, the FDA's interpretation of the Compliance Policy Guide. Mr. Hile indicated that the agency views "commercial distribution" to mean, in its popular sense, "on the market", pursuant to H.R. 94–853, 94th Cong. 2d Sess. 36 (1976). He further stated that:

FDA interprets the phrase "displayed, advertised, or otherwise offered for sale ... for a specific intended purpose" to mean that the device is labeled for that purpose, or, if it was not so labeled, that it was actively promoted for that purpose.

\* \* \* \* \* \*

FDA requires documentation that before [May 28, 1976], the device was labeled for, or promoted for, that intended use. In this case, adequate documentation of separate, specially labeled packaging, and at least one sale prior to May 28, 1976 would satisfy the requirements of the advisory opinion. Adequate documentation must consist of copies of the separately labeled packaging or other contemporaneous documentation of its existence.

In the absence of adequate documentation of labeling, a person seeking to show

commercial distribution for a specific indication must provide evidence that the device was actively promoted for that use. (Govt. Exhibit I at 2–3.)

This explanation, together with the agency's compliance policy guide 7124.26, is a reasonable interpretation of the phrase "commercial distribution". Considering the Act's purpose to protect the public health, it will be accorded substantial deference by this Court. *U.S. v. Rutherford*, 442 U.S. 544, 553–554, 99 S.Ct. 2470, 2475–2476, 61 L.Ed.2d 68 (1979); *Scott v. FDA*, 728 F.2d 322, 324 (CA 6 1984); *Upjohn v. Schweiker*, 520 F.Supp. 58, 62 (WD Mich. 1981), *aff'd*, 681 F.2d 480 (CA 6 1982).

Stryker relies upon the FDA's definition of "commercial distribution", and asserts that it complies with the stated criteria. The Government argues that the FDA's definition of "commercial distribution" has only minor relevance to this action. It asserts that since the device in question did not exist prior to enactment of the amendments, the device necessarily meets none of the criteria set forth in the Compliance Policy Guide.

I find myself in agreement with the Government that the device which it has seized is not the same device manufactured by Meadox prior to enactment of the amendments. The affidavits submitted by the Claimant, and the deposition excerpts which it quotes in its briefs, do not create any material issue of fact concerning the identity of the devices. Instead, they fully support the government's position. These affidavits and deposition excerpts include the following information.

Sometime in 1974, Dr. James A. Arnold, an orthopedic surgeon, began using a Meadox Dacron vascular graft for the shoulder repair of acromioclavicular separations. (Affidavit of Thomas White, ¶ 3.) In 1975, Thomas White discussed with Dr. Arnold the use of Meadox's new product, Microvel, for use in surgical repair of shoulder separations. (Affidavit of Thomas White, ¶ 5.) (Microvel is the Meadox tradename for the Double Velour Dacron vascular graft. *See,* Stryker Corporation's response to FDA memorandum at page 10.) The warp knit construction, double velour surfaces, and tubular construction, were very well suited for shoulder separation repair. (Affidavit of Richard J. Turner, ¶ 2.) Warp knit permitted smooth and uninterrupted fibrous tissue ingrowth following surgical repair, the outer velour surface prevented a "sawing" effect into the clavicle bone, and the inner velour surface continued to act as an anchor for the desired fibrous tissue ingrowth. (Affidavit of Dr. Richard Turner, ¶ 2.)

Dr. Arnold requested in 1976 that Meadox make the vascular graft less elastic and smaller in diameter. (Affidavit of Dr. Richard Turner, ¶ 4.) (Affidavit of Harmon Hoffman, ¶ 3.) These changes were accomplished by Harmon Hoffman, then Manager of New Products at Meadox Medicals. (Affidavit of Dr. Richard Turner, ¶ 4; Affidavit of Harmon Hoffman, ¶ 3.) (Hoffman Deposition, quoted in Stryker Corporation's response to FDA memorandum at 13–18.) Mr. Hoffman increased the tension in the yarn during the manufacturing compacting process, and added what is known as the "H-Beam" longitudinal sewing. (Affidavit of Harmon Hoffman, ¶ 3.) (Hoffman Deposition, quoted in Stryker Corporation's response to FDA memorandum at 13–18.) The longitudinal sewing and the increased tension during compacting reduced the elasticity of this Microvel product. (Hoffman deposition, quoted in Stryker Corporation's response to FDA memorandum at 16–17.) In addition, the "H-Beam" configuration kept the interior of the vascular graft, the lumen, open. (Hoffman Deposition, quoted in Stryker Corporation's response to FDA memorandum at 15–16.) The "Stryker Shoulder 130–10 Dacron Ligament Prosthesis" seized by the Government is the "H-Beam" device which incorporates the shrinking and longitudinal sewing Mr. Hoffman described in his deposition as the "H-Beam" construction. (Hoffman Deposition, quoted in Stryker Corporation's response to FDA memorandum at 13–18.)

While Mr. Hoffman's affidavit initially appears to indicate that Dr. Arnold promoted the "H-Beam" construction device at a meeting of the Society of Biomaterials in April, 1976, Mr. Hoffman clarified that it was not yet in existence in April, 1976, in his deposition. (Govt. Exhibit M, at 43, 46.) Dr. Arnold confirmed in his deposition that no "H-Beam" configuration of the device existed in April 1976. Finally, Stryker states in its Response to FDA Memorandum that the "H-Beam" constructed double velour dacron graft was not in an "H-Beam" configuration routinely before May 28, 1976, at page 3.

The affidavits, deposition testimony, and brief submitted in support of Stryker's Motion for Summary Judgment support, rather than contest, the government's assertion that the device it seized-the "H-Beam" device-was undergoing research and development for two and one-half to three years ending in 1978 or 1979. Because there is no factual dispute concerning whether the device as it is presently manufactured existed in 1976, and because the Claimant's own affidavits indicate that no such dispute exists, it is unnecessary to examine in detail the exhibits offered by the Government in support of its position. It is sufficient to note those which the Court finds persuasive, and to observe that in reviewing the extensive exhibits which the Government submitted, the Court found nothing which would indicate the "H-Beam" device existed prior to enactment of the amendments.

The Court finds persuasive: Dr. Arnold's description of the stitching changes Mr. Harmon made subsequent to 1976 as the double velour vascular graft evolved from no beam, to one beam, to three beams, to the "H-beam", (Govt. Exhibit Q, at 46, 56); a communication from Meadox Medicals, Inc., dated November 25, 1981, to the Food and Drug Administration which states that Dr. Arnold began to use the new "H-Beam" construction for acromiocluvicular separations in 1977, (Govt. Exhibit N, at 2); a reference by Dr. Richard Turner in a letter to the FDA dated August 6, 1982, to "commercialization of the *product precur-*

*sor* prior to legislative enactment in May of 1976", (Govt. Exhibit O at 1); the list of patients that received a Microvel device, indicating that the "H-Beam", otherwise known as the "star beam", was not surgically used until May 25, 1977 (Government Exhibit O, attachment; *see also* Govt. Exhibit G); the agreement entered into on March 22, 1978, between Dr. Arnold, Meadox Medicals, and Orthopedic Research Institute describing the rights of the parties in the device, including the right of Dr. Arnold to receive development costs during the period prior to the non-investigational offering for sale of the device, and payment of royalties upon commercialization of the device, (Govt. Exhibit R); the late 1978 and early 1979 communications between Dr. Arnold and Maurice Delibes, of Meadox's Marketing Department, concerning the art work for marketing the shoulder graft, (Govt. Exhibit T); the Meadox Medicals' interoffice memorandum from Harmon Hoffman to Dr. Richard Turner stating that Mr. Hoffman had clarified to Dr. Arnold the position of Meadox Medicals as a *potential producer* of the device (Govt. Exhibit S); the records of the Meadox Medicals' Product Action Group meetings which occurred throughout 1978 and 1979 detailing the progress of the device's promotional campaign (Govt. Exhibit V); and finally, the existence of US Patent 4,209,859, issued to Harmon Hoffman on July 1, 1980 for the device, (Govt. Exhibit Y).

■ Stryker's assertion that in spite of the modifications in the device which occurred from 1976 to the present, the device is enough like that marketed in 1976 that it should be considered the same is misplaced. The only exemption available to Stryker from the premarket notification requirement is that allowed by 21 C.F.R. § 807.-85(b). This exemption requires that *the* device be in commercial distribution before May 28, 1976. There is no provision in this exemption for a device which is substantially equivalent to one in commercial distribution before May 28, 1976. For this reason, the affidavit and testimony at hearing of

David M. Link, Director of the predecessor organization to the present Center for Devices and Radiological Health from 1974 to 1980, concerning the equivalence of the seized device to the pre-amendments device is irrelevant. Mr. Link's testimony and affidavit are additionally irrelevant because they represent the opinion of one who is no longer in a position with the FDA to effect policy or decisionmaking. Accordingly, Mr. Links' testimony and affidavit do not raise any genuine issue of material fact.

I find that there is no genuine issue of material fact concerning whether the Stryker device is exempt from premarket notification. The seized device did not exist before 1978, and necessarily does not meet the Compliance Police Guide criteria. Stryker has failed to prove even one element of the "commercial distribution" exemption. Accordingly, the Government's Motion for Summary Judgment on this issue shall be granted, and the Claimant's denied.

### 2. Listing

■ Section 510(j) of the Act, 21 U.S.C. § 360(j), requires that medical devices manufactured for commercial distribution be listed with the Secretary. The Government asserts that the Stryker device it has seized is not listed, and supports this assertion with the declaration of Walter E. Gundaker. (Govt.'s Exhibit D.) Stryker asserts that the listing for Meadox's vascular graft products (*See,* Govt.'s Exhibit F) is a sufficient listing for the present device until the FDA finalizes the regulations concerning the classification name of the present device. Stryker observes that 21 C.F.R. § 807.25(f)(1) requires devices to be listed by their classification names, and argues that since none yet exists for the present device, no listing can yet be made. Stryker raised this argument for the first time in its submission filed March 20, 1985.

At the hearing, and in its Response filed March 29, 1985, the Government responded to Stryker's argument. It noted that section 510(j) of the Act, 21 U.S.C. § 360(j), requires "all" devices to be listed. The

Government offered as Plaintiff's Exhibit 2 the declaration of Leighton W. Hansel. Mr. Hansel attests that the instructions which accompanied the listing forms require those listing devices to place the word "none" in the space on the listing form for the classification name when no final classification name yet exists for the device. Attached to Mr. Hansel's declaration are three true and correct copies, kept pursuant to the Food, Drug and Cosmetic Act, which Stryker Corporation submitted for three devices for which no final classification name exists. On each of the three forms, Stryker Corporation, itself, placed the word "none" in the space for the classification name.

It is apparent from section 510(j) of the Act, 21 C.F.R. § 807.25(f)(1), and the instructions, that *all* medical devices must be listed even though no final classification name yet exists for a device. It is also apparent that the FDA instructs those listing devices to place the word "none" in the space for the classification name when no classification name has been finally promulgated. Finally, it is apparent that Stryker Corporation understands this instruction, for it has correctly followed it in the past concerning other devices. This device is not listed as required and there is no genuine dispute concerning any material fact on this issue. Accordingly, the Government's Motion for Summary Judgment on this issue shall be granted, and the Claimant's Motion for Summary Judgment on this issue shall be denied.

### ADULTERATION

■ The Medical Device Amendments establish three device classes. Class III devices are subject to premarket approval before release for commercial distribution. Section 513 of the Act, 21 U.S.C. § 360c. The amendments also divide devices into preamendment and postamendment devices ("old devices" and "new devices") and provide that "old devices" may continue their preamendment status until the FDA requires a premarket approval application to be filed for a given device. Section 513(c)

of the Act, 21 U.S.C. § 360c(c); Section 515(b)(1) of the Act, 21 U.S.C. § 360e(b)(1). A "new device", however, is automatically placed in the class III category, and immediately triggers the requirement for premarket approval. Section 513(f)(1) of the Act, 21 U.S.C. § 360c(f)(1).

The appropriate person may petition the FDA for reclassification of a class III device into a class I or II device, or obtain a FDA decision that the "new device" is "substantially equivalent" to an "old device" or a reclassified "new device". Section 513(f)(1) of the Act, 21 U.S.C. 360c(f)(1). Either result removes the "new device" from class III and obviates the need for class III premarket approval.

The Government asserts that the Stryker device is adulterated pursuant to section 501(f)(1)(B) of the Act, 21 U.S.C. 351(f)(1)(B) because it:

1. Is a "new device" automatically placed in class III (section 513(f) of the Act, 21 U.S.C. § 360(c)(f));

2. Is required to have an "approved application for premarket approval" in effect (section 515(a) of the Act, 21 U.S.C. § 360e(a));

3. Is not exempt from premarket approval as a device for investigational use (section 520(g) of the Act, 21 U.S.C. § 360e(a)); and

4. Does not have any approved premarket application in effect.

It is undisputed that the device is not exempt for investigational use, and that there is no FDA approval of the device. (See, Govt. Exhibit C, Responses 8 and 9; and Govt. Exhibit D.)

Because I have found that the device in question did not exist before May 28, 1976, it was necessarily "new" upon its introduction to the market in 1978 or 1979. It therefore was automatically placed in the class III device category and required an approved application for premarket approval before being marketed. It necessarily follows that the device is adulterated within the meaning of the Act. Stryker's argument that the modifications of the device were not so substantial that they rendered it a new device may be relevant to the issue concerning whether the device may be reclassified as "substantially equivalent" to an "old device". However, such a determination is, in the first instance, the FDA's to make. Section 513(f)(2)(A) of the Act, 360c(f)(2)(A). No petition for reclassification has been filed with the FDA for the Stryker device. No provision in the Act allows a Court to bypass the FDA's reclassification procedures and make the determination itself. (Govt. Exhibit D.) Accordingly, the Government's Motion for Summary Judgment on this issue is granted, and the Claimant's motion on this issue is denied.

### RELIEF

In addition to condemnation of the seized devices pursuant to section 304(d) of the Act, 21 U.S.C. § 334(d), the Government requested at oral argument and provides in its proposed Judgment and Decree of Condemnation and Injunction that it be granted an injunction against Stryker Corporation to prevent the commercial distribution of any dacron orthopedic device in an "H-Beam" configuration unless it first receives specifically requested regulatory approval. Such an injunction would sweep within its prohibition "H-Beam" devices that Stryker distributes for application to the knee and ankle. Stryker asserted at oral argument that this is an action against the seized devices and not against Stryker Corporation. It argued that, accordingly, the requested injunctive relief is beyond the scope of this action.

In support of its request for injunctive relief, the Government cites *US v. An Article of Drug * * * 4,680 Pails*, 725 F.2d 976 (CA 5 1984). The Government asserts that once Stryker has entered a general appearance before this Court, the Court has jurisdiction to enter a decree against Stryker concerning other of its products not seized by the FDA. The Court disagrees with the government's reading of *4,680 Pails*. In that case, the drug manufacturer, after release of the *res* (the seized drug), voluntarily appeared before the district court to

renew a motion for dismissal after the trial court granted a motion for new trial. The Court of Appeals held, essentially, that the drug manufacturer had waived its objection to *in personam* jurisdiction by failing to earlier assert lack of jurisdiction through release of the *res* while continuing to respond to the opposition party's court submissions. The Court found that the district court therefore had *"in personam* jurisdiction over the parties, thus rendering the *res's* arrest nonessential to the court's jurisdiction." 720 F.2d at 984.

Here, Stryker does not seek to dismiss the action on the basis of lack of jurisdiction, but rather asserts that the Government has no authority to reach out to other Stryker products merely because it has seized one. I agree. Unlike the situation in *4,680 Pails,* Stryker has limited its involvement in this action to a defense as the sole owner of the seized articles as it stated it would in its claim filed December 4, 1984. No situation has been created, as it was in *4,680 Pails,* to allow the inference that Stryker has waived any objection to the Court's assertion of *in personam* jurisdiction. The articles seized have remained under the control of the FDA and all of Stryker's involvement in this action has been limited to procurring their release. Under these circumstances, the Court finds that neither it, nor the FDA, can order Stryker to refrain from commercially distributing any devices other than those which are the subject of this action. Accordingly, the government's request for injunctive relief concerning other of Stryker's "H-Beam" devices is denied.