### UNITED STATES of America, Plaintiff,

v.

### UNIVERSAL MANAGEMENT SERVICES, INC., et al., Defendants.

No. 5:95 CV 2768.

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 22, 1997.

requirement has been met.

**976**

Alexander A. Rokakis, Office of U.S. Attorney, Cleveland, OH, Deborah M. Autor, Dept. of Justice Consumer Litigation, Washington, DC, for plaintiff.

Wesley Adelbert Dumas, Sr., Cleveland, OH, Edwin Davila, Canton, OH, Ralph E. Burns, Jr., Klein, Hammerle & Burns, Ft. Lauderdale, FL, for defendants.

## MEMORANDUM AND ORDER

OLIVER, District Judge.

Plaintiff, the United States of America ("Plaintiff"), brings this action against Defendants, Universal Management Services, Inc., Natural Choice, Inc., Paul M. Monea, and Paul A. Monea ("Defendants"). Currently pending before the court are summary judgment motions from both parties, including argument regarding whether disgorgement should be among the remedies should summary judgment be granted in favor of Plaintiff and Defendants' Motion For Clarification of an aspect of an earlier issued preliminary injunction. The court makes the following rulings: 1) Plaintiff's Motion For Summary Judgment (docket no. 65) is granted; 2) Defendants' Motion For Summary Judgment (docket no. 66) is denied; and 3) Defendants' Motion For Clarification (docket no. 88) is denied.

## I.

The following facts are not in dispute. Defendants Universal Management Services, Inc., and Natural Choice, Inc. are Ohio corporations which are managed by Defendant Paul M. Monea and his son, Paul A. Monea. As part of their business, Defendants sell and distribute a product known as the Stimulator, and also a product that connects to the Stimulator known as the Xtender. The Stimulator is essentially a piezo-electric gas grill igniter, marketed as a pain relieving device. To produce the Stimulator, defendants purchase gas grill igniters and outfit them with finger grips. A user then places the tip of the Stimulator on his body, presses with his thumb on a plunger, and an electric current passes into that part of the body. Defendants' advertising literature states that, when applied to certain acupressure points, the Stimulator can relieve numerous kinds of pain (e.g., migraine headaches, swollen joints, allergies). The Xtender is an accessory that allows an individual to use the Stimulator to reach areas of the body otherwise difficult to reach (e.g., the spine).

## II.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set

forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, the court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n. Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case

and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

### III.

As a preliminary note, given the overlap of issues in these motions and the preliminary injunction motion, the court, in ruling on these motions, will use some of the same factual analysis and legal discussion as in the preliminary injunction order. However, clearly a different evidentiary standard applies in the summary judgment context. In granting Plaintiff's motion for a preliminary injunction, the court concluded that

Because defendants obtained from the FDA neither a PMA nor a finding of substantial equivalence, the Stimulator and Xtender are "adulterated" devices under the FDCA. This finding alone entitles the government to the injunctive relief it seeks. When the government seeks an injunction to protect the public health pursuant to statute, as here, it is not required to show irreparable harm, or inadequacy of a remedy at law. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *United States v. City of Painesville, Ohio*, 644 F.2d 1186, 1193 (6th Cir.1981), *cert. denied*, 454 U.S. 894, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). Further, Congress has found that a violation of the FDCA, by itself, results in harm to the public, so there is no need to balance the equities. *Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944);

*United States v. Diapulse Corp. of America,* 457 F.2d 25, 28 (2nd Cir.1972).

In reaching that conclusion, the court was acting as both the finder of facts and law in determining whether Defendants should be enjoined from certain activity pending a determination on the merits of the lawsuit. In the context of ruling on a summary judgment motion, however, the court plays a different role. Here, the court must determine "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." In making this determination, the court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.

### A.

Plaintiff claims that Defendants' sales of the Stimulator and Xtender are violations of the Federal Food, Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"). Specifically, the government claims that defendants have violated 21 U.S.C. § 331(a) and § 331(k), which prohibit misbranding or adulterating medical devices and introducing such devices into interstate commerce. Both Plaintiff and Defendants have now moved for summary judgment on these claims.

To show that Defendants have violated §§ 331(a) & (k), Plaintiff must prove: (1) the Defendants' products are "devices" within the meaning of the FDCA; (2) the devices are adulterated or misbranded; and (3) the devices move in interstate commerce. It is undisputed that Defendants' products move in interstate commerce. Consequently, Plaintiff must prove only that the products are adulterated or misbranded devices.

A device is "adulterated" under the FDCA if it is required to receive premarket approval ("PMA") from the Food & Drug Administration ("FDA"), but did not receive this PMA. 21 U.S.C. § 351(f)(1)(B); *United States v. An Article of Device Consisting of 1,217 Cardboard Boxes,* 607 F.Supp. 990, 998 (W.D.Mich.1985). Whether a device is required to receive a PMA from the FDA depends on a scheme set out in 21 U.S.C. § 360c. Under this scheme, all medical de-vices are categorized as Class I, Class II, or Class III devices. Class III devices are subject to stringent regulatory requirements, Class II devices are subjected to intermediate regulatory requirements, and Class I devices are subjected to minimal regulation. Further, under this scheme, medical devices are either "old devices," meaning they were on the market before 1976, or "new devices," meaning they were not on the market before 1976. All new devices are automatically Class III devices. 21 U.S.C. § 360c(f).

Class III devices cannot be marketed unless either: (1) the manufacturer has submitted to the FDA an application for PMA, and the application had been approved; or (2) the manufacturer submits a "premarket notification" arguing that its device should be reclassified as Class I or Class II because it is substantially equivalent to an existing Class I or Class II device, and the FDA finds that the devices are in fact substantially equivalent.

■ Defendants contend that their products are not violative of §§ 331(a) & (k) for three reasons. First, Defendants that their products are not devices within the meaning of the FDCA. The FDCA's definition of "device" is as follows:

> The term "device" . . . means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . .
>
> (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
>
> (3) intending to affect the structure or any function of the body of man or other animals, and
>
> which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

21 U.S.C. § 321(h). Defendants assert that their products are not a devices because they (1) achieve their primary intended purpose through chemical action and (2) do not have

any effect on the structure or function of the body. However, Defendants have pointed to nothing in the record that creates a genuine issue of fact as to whether their products achieve their primary intended purpose through chemical action. In fact, even Defendants' own witnesses, Dr. Roy Bugay and Dr. Robert Charm, both indicated that Defendants' products do *not* operate through chemical action. As such, Defendants' argument that their products are not devices because they achieve their primary intended purpose through chemical action is not well-taken.

Similarly, not only have Defendants failed to raise a genuine issue of material fact as to whether their products have any effect on the structure or function of the body, but they completely fail to point to anything in the record that even remotely suggests that their products do not have any effect on the structure or function of the body. In fact, Defendants own description of their products leads to only one reasonable conclusion, i.e., Defendants' products have an effect on the structure and/or function of the body. In Defendants' motion for summary judgment, Defendants describe the Stimulator as working as follows: " 'the [] electrical stimuli [from the device]...stimulate excitatory cells which release electrical potentials which set off a chain of...reactions that send messages to the brain creating a responsive reaction that organizes peptides to return the body to homeostasis.' "

It is disingenuous of Defendants to assert that this returning of "the body to homeostasis" is not an attempt to affect the function of the body. Additionally, Defendants assert that the Stimulator "has been found to provide relief for certain ailments," i.e. pain. Pain is a function of the body, and therefore intent to relieve pain is intent to affect that function. *United States v. Undetermined Quantities of Device*, [1981–1982 Transfer Binder] Med. Dev. Rep. (CCH) Para. 15,055, at p. 14,377 (W.D.Mich. Nov. 22, 1982) ("[P]ain is a physical warning signal pro-

duced by the body to indicate that a problem within the body exists. As such, it is a function of the body."). Consequently, the court concludes as a matter of law that both the Stimulator and the Xtender are intended to affect the structure or function of the body, and therefore, are "devices" within the meaning of the FDCA.

■ Second, Defendants contend that even though the Stimulator did not receive a PMA, the Stimulator is not "adulterated" because it is similar to a device marketed prior to May 28, 1976, thereby obviating the need for PMA. However, the only "evidence" submitted in support of such assertion is Defendants' conclusory claim that "[t]estimony by Steve Michelson and his exhibits demonstrate the Stimulator is...identical to a preamendment device." Given that Defendants have not fulfilled their duty of pointing out specific facts in the record which create a genuine issue of material fact on this point, the court concludes that Defendants' assertion that the Stimulator is similar to a device marketed prior to May 28, 1976 does not create a genuine issue of material fact thereby precluding summary judgment.

■ Defendants also assert that the Stimulator is not subject to PMA because it is exempt from approval by current FDA statutes and regulations. This argument is based on the contention that the Stimulator is identical to another device, the "Accu–Magic," which is "listed"[1] with the FDA as a therapeutic massage device a class of products exempt from the premarket clearance requirement of the Medical Device Amendments to the FDCA. Therefore, Defendants contend that the Stimulator should be treated the same as the "Accu–Magic" device and not be required to receive premarket clearance.

In its preliminary injunction order, the court concluded that Defendants' suggestion that their product is a "therapeutic massager" and thus exempt from the FDA regulatory scheme was "completely without merit."

---

1. The device listing requirement, 21 U.S.C. Sec. 360(j), is simply a means by which the MDA keeps a current inventory of devices marketed in the United States. See, e.g., H.R.Rep. No. 92–924, at 1 (1972) (discussing the purpose behind the Drug Listing Act of 1972); H.R.Rep. No. 94–853, at 18 (1976) (adding listing requirement for devices). A submitter's characterization of advice in its listing form is not relied upon for purposes of device classification.

However, Defendants, in their supplementary memorandum in support of their motion for summary judgment, have submitted additional information that the court must evaluate to determine whether Defendants have raised a material issue of fact. Defendants have submitted attachments which indicate that the FDA has accepted registration of the device, the "Accu–Magic," which is identical to the Stimulator, as a Class I device, which are exempt from registration under the more rigid Class III standards, which require premarket approval. However, in its reply brief, Plaintiff has submitted a May 29, 1997 letter from Lilliam Gill of the FDA to the Accu–Magic company informing Accu–Magic that its product is not a therapeutic massager and that it is not exempt from premarket clearance. Given Defendants insistence that the Stimulator is "identical" to the "Accu–Magic" product, the Stimulator is subject to a similar fate.

▮ Additionally, even if the court found Defendants' above-mentioned argument persuasive, given that the Stimulator is a Class III device, Defendants cannot legally market the Stimulator unless they have obtained from the FDA either a PMA or a finding of substantial equivalence. Defendants do not argue they obtained a PMA. However, as discussed above, Defendants do argue that the Stimulator should be reclassified as Class I or Class II because it is substantially equivalent to existing, lawfully marketed, Class I or Class II devices. Defendants' product can only be found substantially equivalent to existing legally marketed devices, however, if the FDA so finds in an order; the defendants cannot dub it so themselves. 21 U.S.C. § 360c(i); *U.S. v. Thor of Genesis*, 885 F.Supp. 1025, 1028 (N.D.Ohio 1995). There is no question that the FDA has not found (and defendants never applied to the FDA for a finding) that the challenged products are substantially equivalent to other lawfully marketed devices. Consequently, the court concludes as a matter of law that because the Stimulator and the Xtender are Class III devices and therefore subject to PMA, Defendants failure to receive such PMA renders their products "adulterated."

In sum, the court has found that the undisputed material facts indicate that both the Stimulator and the Xtender are "devices" within the meaning of the FDCA; (2) the devices are adulterated; and (3) the devices move in interstate commerce. Thus, the court hereby grants summary judgment in favor of Plaintiff. Consequently, Defendants motion for summary judgment is denied.

### B.

▮ In its initial Complaint in this case, in addition to an injunction, Plaintiff asked the court for "its cost and such other relief as the court deems just and proper, including but not limited to equitable disgorgement of profits gained by Defendants from the sale of adulterated and misbranded medical devices." After reading the parties' briefs and evaluating the relevant case law, the court concludes that although disgorgement is a remedy within the court's power to order in this case, such remedy is not the most appropriate in this matter.

While numerous district courts have ordered the equitable remedy of disgorgement in a variety of FTC cases, neither the parties nor the court could find an FDA case where disgorgement of profits was ordered. While the lack of previous use of the equitable remedy of disgorgement of profits in FDA cases is not necessarily fatal to Plaintiff's request for such a remedy, such nonutilization does cast some doubt on the appropriateness of disgorgement in this matter. While the court will not order disgorgement of profits in this case, the court does find that restitution is both available and appropriate. Such remedy will ensure that the public interest is protected by providing each person who purchased Defendants' adulterated product the opportunity to receive his money back.

In *Federal Trade Commission v. Gem Merchandising Corporation*, 87 F.3d 466, 469 (11th Cir.1996), the Eleventh Circuit upheld the District Court's ability to order both injunctive and equitable relief and noted:

In *Porter*, [*Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946)] the Supreme Court upheld the district court's authority to refund illegal

rent overcharges pursuant to section 205(a) of the Emergency Price control Act of 1942, which expressly granted only the power to enjoin illegal practices. In so holding, the Court wrote that

> [u]nless otherwise provided by statute, all the inherent equitable powers of the District court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. Power is thereby resident in the District court, in exercising this jurisdiction, "to do equity and to mold each decree to the necessities of the particular case." *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 [(1944)]. . . .

> Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. *Porter,* 328 U.S. at 398, 66 S.Ct. at 1089 (citations omitted).

As *Porter* makes clear, absent a clear command to the contrary, the district court's equitable powers are extensive. Among the equitable powers of a court is the power to grant restitution and disgorgement. *See, e.g., FTC v. Security Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1316 (8th Cir.1991) (restitution); *Amy Travel Service,* 875 F.2d [564,] 570 [(7th Cir.1989)] (restitution); *SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978) (disgorgement).

In light of this above-analysis, the fact that the FDCA does not contain a clear command indicating that restitution is not a remedy within a district court's power, coupled with the Supreme Court's admonition that "remedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health," *United States v. An Article of Drug Bacto–Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969), the court is convinced that not only is ordering restitution within its power in this matter, but that such remedy is appropriate. Such a remedy will send a message to both Defendants and others engaged in similar behavior that if they violate the law, they will not be able to keep the proceeds from such illicit activity, but instead will have to refund all customers the purchase price of the adulterated goods.

Given that the court has considered the Complaint, both parties' summary judgment motions, the memorandum of law filed in support, and all related documents, and finds that Defendants have violated the law and, unless restrained by Order of the court, may continue to violate the FDCA, and summary judgment having been granted for the Plaintiff;

IT IS HEREBY ORDERED that:

The court has jurisdiction over the subject matter and over all parties to this action.

1. The Complaint for Injunctive and Equitable Relief states a cause of action against Defendants under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–395.

2. Defendants, Paul M. Monea, and Paul A. Monea, individuals, and Universal Management Services, Inc., and Natural Choice, Inc., doing business as Natural Choice Products, Inc., corporations, and each of their directors, officers, agents, servants, employees, successors, assigns, attorneys, and any persons in active concert or participation with any of them, shall permanently be enjoined under 21 U.S.C. § 332(a) from directly or indirectly doing or causing to be done the importing, procuring, receiving, manufacturing, assembling, preparing, processing, packing, labeling, promoting, holding, distributing, shipping, or selling of any device as defined in 21 U.S.C. § 321(h), unless and until:

   a. All facilities in which Defendants manufacture, assemble, prepare,

process, pack, or label devices are registered as required by 21 U.S.C. § 360; *and*

b.  All devices owned by Defendants, under their custody or control, or in any manner associated with Defendants are included in a list as required by 21 U.S.C. § 360(j), *and* with respect to each such device, one of the following has occurred:

i.  The Food and Drug Administration (FDA) has received a premarket notification as required by 21 U.S.C. § 360(k) for the device and has determined pursuant to 21 U.S.C. § 360c(I)(1)(A) that the device is substantially equivalent to a device for which premarket approval is not required; or

ii.  An FDA approved application for premarket approval, filed pursuant to 21 U.S.C. § 360e, for such device is in effect; or

iii.  An FDA approved investigational device exemption, filed pursuant to 21 U.S.C. § 360j(g) and 21 C.F.R. Part 812, for such device is in effect, and the use and distribution of the device conforms to those requirements; *and*

c.  FDA notifies Defendants in writing that Defendants appear to be in compliance with the requirements set forth in Paragraphs III.A. and III.B. of this Order.

3.  All devices, including each component, part, and accessory thereof, in the possession or control of Defendants or in any manner associated with Defendants as of the date of entry of this Order shall be destroyed within sixty (60) days of the date of entry of this Order, at Defendants' expense under FDA's supervision and in accordance with all federal and state laws and regulations, unless within sixty (60) days of the date of entry of this Order, Defendants have submitted in writing to FDA and FDA has approved in writing a plan to attempt to bring those devices into compliance with the Act (the "Reconditioning Plan"). If during any thirty (30) day period after approval of the Reconditioning Plan by FDA, in FDA's judgment, Defendants have made no good faith efforts to implement the Reconditioning Plan, all devices subject to this paragraph shall be destroyed immediately thereafter at Defendants' expense under FDA's supervision and in accordance with all federal and state laws and regulations. If Defendants do not destroy devices as required by this paragraph, FDA shall have the right to seize and destroy those devices without notice to Defendants and without Defendants' consent, and to require Defendants to pay all costs associated with that destruction.

4.  Defendants may not attempt to bring any devices subject to Paragraph IV of this Order into compliance until they have received written authorization from FDA to do so. No articles that have been reconditioned pursuant to Paragraph IV of this Order may be released or delivered for introduction into commerce unless and until FDA has authorized in writing such release or delivery. Before authorizing such release or delivery, FDA may require Defendants to provide written information, such as the names and addresses of all purchasers of the reconditioned articles, as the agency deems necessary to determine the acceptability to the agency of the release or delivery.

Within thirty (30) days of the date of entry of this Order, Defendants shall provide in writing to FDA: (1) the full names, addresses, and phone numbers of all entities and individuals who, at any time, have been involved in the importing, procuring, receiving, manufacturing, assembling, preparing, processing, packing, labeling, promoting, holding, distributing, shipping, or selling of any device in any manner associated with Defendants including but not limited to the Stimulator, the Xtender, and each component, part, or accessory thereof, and a detailed description of the involvement, including the time frame thereof, of each entity and individual; (2)

the full names, addresses, and phone numbers of all entities and individuals who, at any time, have supplied or manufactured components, parts, or accessories for any device in any manner associated with Defendants including but not limited to the Stimulator and the Xtender, and a detailed description, including the name and address of the manufacturer thereof and the quantity thereof, of the components, parts, and accessories supplied or manufactured by each entity and individual; (3) the addresses of all locations where any device in any manner associated with Defendants including but not limited to the Stimulator, the Xtender, and each component, part, or accessory thereof, at any time, has been imported, procured, received, manufactured, assembled, prepared, processed, packed, labeled, promoted, held, distributed, shipped, or sold, and a detailed description of the importing, procuring, receiving, manufacturing, assembling, preparing, processing, packing, labeling, promoting, holding, distributing, shipping, or selling that was done at each location and when it was done at each location; (4) the full names, addresses, and phone numbers of all entities and individuals who, at any time, have purchased fifty (50) or more of any device in any manner associated with Defendants including but not limited to the Stimulator, the Xtender, and each component, part, or accessory thereof, from Defendants or anyone acting on behalf of or associated with any of them; and (5) the full names, addresses, and phone numbers of all entities and individuals who have, or at any time have had, any rights to import, procure, receive, manufacture, assemble, prepare, process, pack, label, promote, hold, distribute, ship, sell, or otherwise transact business with respect to any device in any manner associated with Defendants including but not limited to the Stimulator, the Xtender, and each component, part, or accessory thereof, and a detailed description of the rights of each entity and individual.

5. Defendants and each of their directors, officers, agents, servants, employees, successors, assigns, attorneys, and any persons in active concert or participation with any of them, are permanently enjoined from directly or indirectly doing or causing to be done any of the following acts: (1) violating 21 U.S.C. § 331(a) by introducing or delivering for introduction into interstate commerce any article of device that is adulterated or misbranded; (2) violating 21 U.S.C. § 331(k) by causing the adulteration or misbranding of any article of device while the device is held for sale after shipment in interstate commerce of the device or one or more of its components; and (3) violating 21 U.S.C. § 331(p) by failing to register in accordance with 21 U.S.C. § 360, or by failing to provide listing information required by 21 U.S.C. § 360(j) or premarket notification information required by 21 U.S.C. § 360(k).

6. Defendants immediately shall institute, as FDA deems necessary, recalls of devices imported, procured, received, manufactured, assembled, prepared, processed, packed, labeled, promoted, held, distributed, shipped, or sold by Defendants or anyone acting on behalf of any of them.

7. If at any time following resumption of operations as authorized by Paragraph III of this Order, Defendants fail to comply with the Act or the requirements of this Order, FDA may notify Defendants in writing of Defendants' failure to comply and may require Defendants to halt immediately all importing, procuring, receiving, manufacturing, assembling, preparing, processing, packing, labeling, promoting, holding, distributing, shipping, or selling of devices. Upon receipt of such notice, Defendants shall immediately halt all such activity. A written notice by FDA pursuant to this paragraph shall remain in effect unless and until FDA rescinds or modifies that notice in writing.

8. FDA representatives are authorized, as is reasonably necessary to inspect Defendants' facilities and all equipment, finished and unfinished materials and product, containers, labeling,

and other promotional material therein, to take photographs, videotapes, and sound recordings, and to examine and copy all records relating to the importing, procuring, receiving, manufacturing, assembling, preparing, processing, packing, labeling, promoting, holding, distributing, shipping, or selling of any of Defendants' products, of components, parts, or accessories of those products, of labeling for those products, or of promotional material for those products, to assure continuing compliance with the terms of this Order. Such inspections shall be permitted upon presentation of a copy of this Order and appropriate credentials. The inspection authority granted by this Order is separate from, and in addition to, the authority to make inspections under the Act, 21 U.S.C. § 374.

9. As a part of the inspections authorized under Paragraph X of this Order, upon written or oral request by FDA, Defendants shall provide to FDA access to their complete computer system, including all current and out-dated backup tapes and disks, for 3 full days (and longer if necessary) from 9:00 a.m. to 5:00 p.m. in order to create a backup of the entire system and perform any other functions determined by FDA to be necessary. During this period, Defendants shall make available all documentation related to the computer system, and shall make available, in person, both their system expert and an individual who has knowledge of all passwords, knowledge of how data is entered into the computer system, knowledge of how the computer software operates, knowledge of what specific data fields represent, and knowledge of how to create a backup of the system.

10. Defendants shall reimburse FDA for the costs of all FDA inspections, examinations, supervision of reconditioning, or other work done pursuant to any part of this Order at the standard rates prevailing at the time the activities are accomplished. As of the date of entry of this Order, those rates are $53.73 per hour or fraction thereof per representative for inspection work; $64.43 per hour or fraction thereof per representative for analytical work; and 31 cents per mile for travel expenses. Defendants shall also reimburse FDA for the prevailing subsistence expenses for government employees. In the event that the standard rates generally applicable to FDA supervision of court-ordered compliance are modified, these rates shall be increased or decreased without further order of the Court.

11. Within five (5) days of the date of entry of this Order, Defendants shall serve a copy of the Order, by personal service or certified mail (restricted delivery, return receipt requested), on each of their directors, officers, agents, servants, employees, successors, assigns, attorneys, and any persons in active concert or participation with any of them. Within ten (10) days of the date of entry of this Order, Defendants shall provide FDA and Plaintiff's attorneys with a notarized affidavit of compliance, signed under penalty of perjury by each of the two individual Defendants and by Defendants' attorney, stating the fact and manner of compliance with this paragraph and listing the names and positions of all persons so notified, and the date each was notified, and attaching a copy of the executed certified mail return receipts, and a copy of any correspondence served or mailed with the Order. Within ten (10) days of receiving a written or oral request from FDA or Plaintiff's attorneys for any information or documentation that FDA deems necessary to evaluate compliance with this paragraph, Defendants shall provide such information or documentation.

12. In the event that, at any time after entry of this Order, any individual or entity becomes a director, officer, agent, servant, employee, successor, assign, or attorney of any Defendant,

or becomes a person in active concert or participation with any of those persons or with any Defendant, Defendants shall: (1) within five (5) days serve a copy of the Order, by personal service or certified mail (restricted delivery, return receipt requested) on that person; and (2) within five (5) more days provide FDA and Plaintiff's attorneys with a notarized affidavit of compliance, signed under penalty of perjury by each of the two individual Defendants and by Defendants' attorney, stating the fact and manner of compliance with this paragraph and listing the names and positions of all persons so notified, and the date each was notified, and attaching a copy of the executed certified mail return receipts, and a copy of any correspondence served or mailed with the Order. Within ten (10) days of receiving a written or oral request from FDA or Plaintiff's attorneys for any information or documentation that FDA deems necessary to evaluate compliance with this paragraph, Defendants shall provide such information or documentation.

13. Defendants shall notify FDA in writing at least ten (10) days before any reorganization, dissolution, assignment, or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries, or any other change in the corporate structure of Universal Management Services, Inc., Natural Choice, Inc., or Natural Choice Products, Inc., or the sale or assignment of any business assets, such as buildings, equipment, or inventory, that may affect compliance obligations arising out of this Order. Defendants shall: (1) within five (5) days of the emergence of a successor, assign, subsidiary, or other affiliated corporate entity, serve a copy of this Order by personal service or certified mail (restricted delivery, return receipt requested) on that new entity; and (2) within five (5) more days provide FDA and Plaintiff's attorneys with a notarized affidavit of compliance, signed under penalty of perjury by each of the two individual Defendants and by Defendants' attorney, stating the fact and manner of compliance with this paragraph and listing the names and positions of all persons so notified, and the date each was notified, and attaching a copy of the executed certified mail return receipts, and a copy of any correspondence served or mailed with the Order. Within ten (10) days of receiving a written or oral request from FDA or Plaintiff's attorneys for any information or documentation that FDA deems necessary to evaluate compliance with this paragraph, Defendants shall provide such information or documentation.

14. This Order shall apply to all of Defendants' successors or assigns, including any licensees or any other persons with rights to import, procure, receive, manufacture, assemble, prepare, process, pack, label, promote, hold, distribute, ship, sell, or otherwise transact business with respect to any device in any manner associated with Defendants including but not limited to the Stimulator, the Xtender, and each component, part, or accessory thereof.

15. Any notices or other information this Order requires Defendants to give to FDA shall be given in writing via registered mail to the District Director, Cincinnati District Office, Food and Drug Administration, 1141 Central Parkway, Cincinnati, Ohio 45202.

16. FDA's decisions under this Order shall be reviewed, if necessary, under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A).

17. Within forty-five (45) days of the date of entry of this Order, Defendants shall provide to Plaintiff's attorneys all records that in any way relate to the distribution of the Stimulator and the Xtender from May 4, 1995, to the date of entry of this Order, including but not limited to: all records relating

to purchase or receipt of the Stimulator, the Xtender, or any components, parts, or accessories of either of them; all records relating to sale or shipment of the Stimulator, the Xtender, or any components, parts, or accessories of either of them; all accounting records for Defendants; all state and federal tax returns for Defendants for each tax year beginning in 1994 and ending in the year of entry of this Order; all records from all bank accounts that hold or at any time have held funds related to the Stimulator or the Xtender; and all records relating to income of Defendants related to the Stimulator or the Xtender, including but not limited to records of sales receipts, commissions, salaries, or licensing fees.

18. Within thirty (30) days of the date of entry of this Order, Defendants shall provide to Plaintiff's attorneys the names and addresses of all individuals and entities who have purchased one or more Stimulator or Xtender device(s) at any time from May 4, 1995, to the date of entry of this Order, and the amount of money spent by each individual and entity.

19. Within forty-five (45) days of the date of entry of this Order, Defendants shall submit to Plaintiff's attorneys a proposed notice to every individual and entity who has purchased one or more Stimulator or Xtender device(s) at any time from May 4, 1995, to the date of entry of this Order indicating that if they desire and indicate so in writing, they are entitled to a full refund of the purchase price of such device(s). If Plaintiff's attorneys find said proposed notice acceptable, Defendants shall, at their own expense, send such notices within thirty (30) days of Plaintiff's approval of the notices to every individual and entity who has purchased one or more Stimulator or Xtender device(s) at any time from May 4, 1995, to the date of entry of this Order. If the parties cannot agree on the nature or wording of the notice, such dispute should be promptly submitted to the court for resolution.

20. Within sixty (60) days of the date of entry of this Order, Defendants shall submit to Plaintiff's attorneys the full names, addresses, and phone numbers of all entities and individuals who, at any time, have purchased any device in any manner associated with Defendants including but not limited to the Stimulator, the Xtender, and each component, part, or accessory thereof, from Defendants or anyone acting on behalf of or associated with any of them.

21. Where necessary to implement the requirements of this Order or ensure compliance with this Order, attorneys for Plaintiff may, for a period of two (2) years following the date of entry of this Order, conduct further discovery on any issue related to this Order.

22. If any Defendant(s) violates this Order and is found in civil or criminal contempt thereof, such Defendant(s) shall pay a fine of $5,000 for each day for which any violation is established.

23. If any Defendant(s) violates this Order and is found in civil or criminal contempt thereof, such Defendant(s) shall, in addition to other remedies, reimburse Plaintiff for its attorney fees, including overhead, and all other costs related to contempt proceedings, including investigatory and administrative costs.

24. This Court retains jurisdiction over this action and the parties hereto for the purpose of enforcing and modifying this Order and for the purpose of granting such additional relief as may hereafter be necessary or appropriate.

## C.

█ The only remaining issue is Defendants' Motion For Clarification. In its prior order, the court ordered that until several still unfulfilled conditions had been met:

Defendants, as well as each and all of their directors, officers, agents, servants, em-

ployees, successors, assigns, attorneys, and any persons in active concert or participation with any of them, shall, during the pendency of this action, be enjoined under 21 U.S.C. § 332(a) from directly or indirectly doing or causing to be done the importing, manufacturing, processing, packing, labeling, promoting, advertising, distributing, holding, or selling of any device, as defined in 21 U.S.C. § 321(h), unless and until:

On November 7, 1997, Defendants filed a motion asking that "[b]ecause export is neither prohibited by the Court's Order nor the relevant statutes, Defendants respectfully request that the Court clarify its Order to reflect that Defendants may export their products."

The court's injunction prohibits the "distributing," "selling," "processing," "packing," and "labeling" of both the Stimulator and the Xtender. Clearly, all of these actions would be undertaken if Defendants' products were exported. Additionally, the court ordered that "[a]ll devices in the possession or control of defendants as of the date of entry of this order, except those devices that are brought into compliance with paragraph I of this order, shall be destroyed...." Obviously, a device that has been destroyed, by definition, cannot be exported. Consequently, if there was any doubt, the court's injunction includes prohibiting Defendants' products from being exported.

Defendants contend, however, that a statutory exemption in the Act permits the export of certain adulterated and misbranded medical devices. The exemption states, in relevant part:

(1) A...device...intended for export shall not be deemed to be adulterated or misbranded under this chapter if it—

(A) accords to the specifications of the foreign purchaser,

(B) is not in conflict with the laws of the country to which it is intended for export,

(C) is labeled on the outside of the shipping package that it is intended for export, and

(D) is not sold or offered for sale in domestic commerce....

(2) Paragraph (1) does not apply to any device—

(A) which does not comply with an applicable requirement of section...360e of this title [pertaining to premarket approval requirements],...

unless, in addition to the requirements of paragraph (1), [FDA] has determined that the exportation of the device is not contrary to public health and safety and has the approval of the country to which it is intended for export.

21 U.S.C. § 381(e).

Under 21 U.S.C. § 381(e)(2)(A), the exemption "does not apply to any device" that fails to "comply with an applicable requirement of...[21 U.S.C. § ] 360e," relating to premarket approval of medical devices, unless the FDA issues the statutorily-required determination permitting exportation. Because the court found that Defendants' devices did not comply with applicable premarket approval requirements and Defendants did not request an FDA determination that would allow the exportation of their devices, Defendants cannot qualify for the export exemption in 21 U.S.C. § 381(e). Accordingly, Defendants' Motion For Clarification is denied.

IT IS SO ORDERED.